JOHN C. DEMOSS AND MARY DEMOSS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
DeMoss v. Commissioner
Docket No. 26780-90
United States Tax Court
T.C. Memo 1993-636; 1993 Tax Ct. Memo LEXIS 653; 66 T.C.M. (CCH) 1834; December 29, 1993, Filed *653 John C. DeMoss and Mary DeMoss, pro se. For respondent: David L. Zoss. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION [1]
GERBER, Judge: Respondent, by means of a statutory notice of deficiency, determined income tax deficiencies and additions to tax for petitioners' 1986, 1987, and 1988 taxable years, as follows: Additions to Tax Income
Sec. Sec. Sec.
Year
Tax 6653(a)(1)(A)
6653(a)(1)(B)
6661
1986
$ 24,038
$ 1,202
[1]
$ 6,010
1987
13,090
655
[2]
3,273
1988
11,601
[3] 580
[4]
2,900
Additionally, respondent requested the Court to impose *654 penalties under section 6673. [2]
The issues for our consideration are: (1) Whether petitioners reported the correct amount of management fees and interest income and expense from certain real properties, and whether the interest expense deductions are business deductions or itemized deductions; (2) whether petitioners have shown entitlement to deductions and losses attributable to Lonestar Farmco, Inc., for 1986 in excess of the amounts determined by respondent; (3) whether petitioners are entitled to various deductions claimed on Schedules C and F and, if so, whether they are business deductions or itemized deductions; (4) whether petitioners are liable for any of the additions to tax determined by respondent; and (5) whether petitioners should be required to pay a penalty under section 6673. The parties have stipulated *655 facts and exhibits that are incorporated by this reference. Petitioners are married and resided in Minneapolis, Minnesota, at the time the petition in this case was filed. Petitioners filed timely joint Federal income tax returns for the taxable years 1986, 1987, and 1988. Petitioners, by agreement, permitted the period for assessment for 1986 to be extended, and the notice of deficiency was mailed within the period for assessment of the 1986 taxable year. Petitioners' books were kept and their income tax return filed on the cash method of accounting. John C. DeMoss (hereinafter references to petitioner in the singular are to John C. DeMoss) was engaged in the practice of law through a solely owned subchapter C corporation. He maintained two corporate bank accounts -- a business account and a trust account. The corporation is not a party to this proceeding. However, references to petitioner's law practice are necessary because the income and/or expenditures of petitioner's law practice were commingled with other activities of petitioners for tax reporting purposes. Petitioner allocated income and expenses between the law practice and other activities in an arbitrary manner. *656 Petitioners have four daughters -- Christine, born 1965, Catherine, born 1968, Diane, born 1969, and Joanne, born 1972. During the years in issue, Christine was a full-time college (1986-87) and law (1988) student residing in petitioners' home. She paid her tuition of at least $ 1,500 for college and $ 7,500 for law school. While in college she was a member of a sorority and spent some time there every day and overnight on occasion. She studied American Studies and did not take any accounting courses in college. Catherine was a full-time high school (for the first part of 1986) and college student during the years in issue. For 1986, 1987, and 1988, she reported income from providing music lessons. Diane was a full-time high school (1986 through mid-1987) and college (1987-88) student, and she reported income from providing skating and music lessons. Joanne was a full-time public school student during 1986 through 1988. For 1988, Joanne reported income from providing music lessons. Petitioner had two brothers in Phoenix, Arizona, and two brothers and a sister in Minneapolis, Minnesota. Petitioner's brothers, during the years in question, were involved in the following *657 professions: Doctor, stockbroker, attorney, and accountant. Petitioners had several sources of income. Petitioner's general practice of law provided most of the income reported in the corporate returns; however, a small portion of the income reported in the corporate returns was attributable to petitioner's brothers and sister in connection with various investment properties. In addition to his law practice, petitioner was a 30.155-percent shareholder in Lonestar Farmco, Inc., a Texas corporation that held three parcels of Texas farmland. Petitioners also had seller's interests in three real estate parcels (Haddon, Willard, and 999 Grand) and an interest in a partnership that held a seller's interest in realty located on Stevens Avenue (Stevens partnership). All of these interests were located in the vicinity of Minneapolis, Minnesota. Mary DeMoss, through her family, had investment interests in Eau Claire, Wisconsin, which were denominated as "DeMoss Diversified". Mary DeMoss's sister managed her investment interests and received a fee for her services. Petitioners' Real Property Interests
The Haddon Property -- consisted of land and a 26-unit apartment building *658 and was acquired by petitioner and his brothers. Petitioner had a 24-percent interest and his brothers had either a 24 or 14-percent interest, the sum of which totaled 100 percent. The Haddon property was acquired in 1971, and petitioner and his brothers had paid off the mortgage by 1981. No partnership agreement existed between petitioner and his brothers concerning the Haddon property. In 1979, the Haddon property was sold to Mansoor Alyeschmerni (Mansoor) under a contract for deed. Mansoor was to make monthly payments of principal and interest, along with one-twelfth of the real property taxes, to the DeMoss brothers during the years in question. Additionally, Mansoor was to maintain casualty and liability insurance in favor of the DeMosses. The Willard Property -- was land and a 40-unit apartment building which was acquired under a contract for deed by the DeMoss brothers in 1972. Three DeMoss brothers, including petitioner, held 27-percent interests, and the remaining two brothers owned 10 and 9-percent interests, respectively. No partnership agreement existed between petitioner and his brothers concerning the Willard property. All payments required under the contract *659 for deed were completed as of 1982. In 1979, the DeMoss brothers sold the Willard property under a contract for deed to Ira, Max, and Helen Kip (the Kips). The Kips, in turn, sold the Willard property, under a contract for deed, to Mr. Delisle. The Kips were to make monthly payments, including one-twelfth of the real property taxes, to the DeMoss brothers during the years in issue. The Kips were also required to maintain insurance on the Willard property. The 999 Grand Property -- was acquired by a warranty deed to the DeMoss brothers from the Kips in lieu of an $ 85,000 downpayment in connection with the sale of the Willard property to the Kips. The DeMoss brothers held the same percentage interests in the 999 Grand property as they had held in the Willard property. In order to liquidate the Kips' mortgage on the 999 Grand property, the DeMoss brothers obtained a purchase money mortgage. Petitioner and his brothers incurred interest on this mortgage during the years in issue. No partnership agreement existed between petitioner and his brothers concerning the 999 Grand property. During 1979, this property was sold to John Magnuson (Magnuson) under a contract for deed. *660 Magnuson was to make monthly payments, including one-twelfth of the real property taxes, to the DeMoss brothers during the years in issue. The Stevens Partnership -- Petitioner acquired a 10.55-percent interest in this partnership in 1974. The remainder of the DeMoss brothers had 10.55, 10.55, 20.35, and 5.80-percent interests, respectively. In addition, there were four other unrelated partners, each holding a 10.55-percent interest. The Stevens partnership acquired land and three apartment buildings containing an aggregate of 114 apartments (the Stevens property) during 1974 under contracts for deed. During the years in issue, the partnership was obligated to make monthly payments to the seller, to pay the annual real property tax, and to maintain insurance. In 1979, the Stevens partnership sold the real property interests to Mansoor under a contract for deed. Mansoor was to make monthly payments, including one-twelfth of the real property taxes, to the Stevens partnership during the years in issue. Mansoor was also obligated to maintain insurance on the real property. In 1984, Mansoor sold his interest in the Stevens property to Shelter Tech Corporation (Shelter) under *661 a contract for deed, but in 1987 he reacquired the property from Shelter in lieu of a foreclosure action. Mansoor's involvement with the DeMoss brothers was initially with petitioner's brother, and was eventually with petitioner. Mansoor recalled meeting petitioner at the property only on one occasion. Mansoor was responsible for leasing, evictions, collecting rent, paying real property taxes, maintaining and repairing the buildings, and obtaining the insurance. Mansoor did not have any particular problems with tenants at the Stevens property. During 1984 through 1987, Shelter was responsible for the same responsibilities attributed to Mansoor above. Mansoor may have been late with his payments to the Stevens partnership ona few occasions, but he was not more than a few days late on those occasions. Mansoor recalled one occasion where petitioner had telephoned about a late payment. All other obligations regarding the Stevens property were timely performed. During 1986, two fires occurred at the Stevens property. The local fire department estimated that the fires caused damage of $ 400 and $ 80,000, respectively. Management Fees -- The Stevens partnership paid petitioner *662 and two of his brothers $ 900 monthly for management of the property. These payments, totaling $ 32,400 annually, were used to decrease the amount of income reported by the partnership for 1987 and 1988. In support of these claimed deductions, the DeMosses submitted at trial monthly report forms reflecting active and ongoing management of the Stevens property. Those reports state that petitioner and/or his brothers inspected, managed, and maintained such things as the electrical, plumbing, heating, and ventilating systems in the buildings. On audit those reports were not shown to respondent's examining agent, and respondent allowed only $ 1,642 for management services in each year, disallowing the remaining amount of the claimed management deduction. The monthly report forms were not contemporaneously created documents, but instead were created for purposes of trial. The estate of one of the unrelated partners in the Stevenspartnership disputed the management fees in connection with the Stevens property. Petitioners have not shown entitlement to a deduction for services in excess of the amounts allowed by respondent for the 1987 and 1988 taxable years. No management fees were *663 received concerning any property other than the Stevens property. Therefore, petitioners are entitled to deduct their percentage interest of the $ 1,642 management fees allowed by respondent for 1987 and 1988. Petitioners owned a 10.55-percent interest in the Stevens partnership and, accordingly, are entitled to deduct, as an itemized deduction, $ 173.23 for 1987 and 1988 in connection with their investment activity. The receipts from the Haddon, Willard, and 999 Grand properties and the Stevens partnership were all deposited in petitioner's law practice's trust bank account. Concerning the Haddon, Willard, and 999 Grand properties, about 15 checks were written each month. Concerning the Stevens partnership, 13 checks were written in all months except May 1988 and October 1987 and 1988 when 14 checks were written. Interest Income and Expense -- In connection with the Stevens partnership, interest was paid by the DeMosses in the amounts of $ 22,826 during 1987 and $ 21,434 during 1988. Petitioner's 10.55- share of these interest payments would be $ 2,408 and $ 2,261, respectively. During 1987 and 1988, Mansoor paid interest to the Stevens partnership in the total amounts *664 of $ 92,636.00 and $ 90,364.88, respectively. Petitioner's 10.55 percent share of the interest income would be $ 9,773 and $ 9,533, respectively. The Stevens partnership reduced the interest income by the interest expense and an additional $ 32,400 in management fees each year, arriving at "net interest earned" of $ 37,409.92 and $ 36,530.95 for 1987 and 1988, respectively. Petitioners reported 10.55 percent of the net amounts, or $ 3,946.75 and $ 3,854.02 for 1987 and 1988, respectively. The DeMosses paid interest on the 999 Grand property in the amounts of $ 8,638.57 and $ 8,257.55 for 1987 and 1988, respectively. Petitioner's 27-percent share of these amounts is $ 2,332 and $ 2,230 for 1987 and 1988, respectively. The DeMosses received interest income on the 999 Grand property in the amounts of $ 14,385.21 and $ 14,026.43 for 1987 and 1988, respectively. Petitioner's 27-percent share of those amounts are $ 3,884 and $ 3,787 for 1987 and 1988, respectively. Petitioners reported the net differences between the interest received and interest paid, or $ 1,551.59 and $ 1,557.60 for 1987 and 1988, respectively. Respondent determined that the share of petitioners' interest income *665 for the Stevens partnership and the 999 Grand property should have been reported separately from the interest expense for those properties. Respondent's determination treats the interest income as part of gross income and the interest expense as a deduction, subject to the limitations on deductions from adjusted gross income. Although petitioners are not in a trade or business, they are engaged in an investment activity, through a partnership and other joint ventures, in which real property has been purchased and sold. Under the terms of the transactions, petitioners and related joint venturers continue to make payments (including interest) on a purchase money mortgage and/or their contracts for deed with a predecessor-owner. In turn, petitioners and related joint venturers receive payments (including interest) from their successor in interest under contracts for deeds. This activity is clearly within the type contemplated under section 212. The question remains, however, whether the interest paid by petitioners and related joint venturers is deductible from gross income as a business expense or is deductible from adjusted gross income as an itemized deduction. The interest *666 paid does not fit within the meaning of a deduction attributable to rents and royalties under section 62(a)(4), therefore, the interest would constitute a nonbusiness expense and is a deduction that must be itemized by petitioners. [3]
Accordingly, petitioners must include their share of the interest received in gross income and are entitled to claim their share of the interest expense, to the extent computationally permitted in each year, as an itemized *667 deduction from adjusted gross income. Petitioners' Farming Activities
Petitioners and three brothers and their wives acquired interests in three parcels of generally unimproved farmland. In 1971 and 1972, petitioners had a 25-percent interest in the three parcels of Texas citrus farmland. Two of the parcels are about 3 miles apart, and the third is about 30 miles from the other two. During the years in issue, petitioners and two brothers and their wives each held a 30.155-percent interest, and the remaining brother and wife held a 9.535-percent interest. In 1983, petitioner and three of his brothers formed a Texas corporation (Farmco) and held shares in the same proportion as their percentage interest in the three parcels of farmland. Farmco was operated as a corporation and reported as an electing subchapter S corporation. Petitioners reported their distributable share of income or loss from the subchapter S return and claimed additional deductions on the basis that they were in the trade or business of farming. Farmco purported to purchase the citrus trees growing on the property, but the stated consideration for the citrus trees was never paid. Farmco leased the *668 three parcels of farmland and citrus trees. Petitioner and his brothers were the officers of Farmco and made business decisions by consensus. In 1983, all of the citrus trees on one parcel and most of the citrus trees on another were killed by adverse weather conditions. After that time, the remaining trees on the second parcel were no longer tended or maintained, but the fruit that grew was harvested annually. The remaining parcel continued as an operating citrus farm. In addition, other crops were grown on the farmland under sharecrop arrangements with local sharecroppers. Respondent determined that petitioners were not in the trade or business of farming [4] and that they were not entitled to claim additional deductions relating to Farmco on the Schedules F attached to their income tax returns. Whether a particular activity constitutes a trade or business is a factual question to be determined from all the facts available to the fact finder. Commissioner v. Groetzinger, 480 U.S. 23 (1987). Petitioners also bear the burden of proving this determination is in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). *669 The Supreme Court pointed out that: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. * * * [Whipple v. Commissioner, 373 U.S. 193, 202 (1963).] Citrus fruit was Farmco's primary source of income, representing $ 212,131.24 of $ 231,515.83 gross income for 1987. For 1988, $ 126,042.17 was reported from citrus out of $ 135,096.94 of gross income. The day- *670 to-day operations of Farmco citrus activity were conducted under contract with John L. Williams (Williams). Williams was paid a monthly fee, and he also received commissions when the citrus was sold. Williams was relied upon to make operating decisions and generally take care of matters on his own initiative, including an ongoing relationship with the sharecroppers. During the years under consideration, petitioner engaged in eight telephone conversations with Williams. Farmco had no employees, owned no equipment, and held title to only one improvement to the realty, consisting of a frame residence on one of the three farms. There was limited deposit and check writing activity (about three or four per month) in Farmco's checking accounts during the years in issue. Petitioners, on Schedule F of their joint Federal income tax returns, claimed to be in the business of farming in connection with the Farmco activity. Respondent determined that petitioner's activity was that of an officer and shareholder, and that any expenditure that could be proven would only be deductible in connection with petitioner's investment in Farmco. Petitioner did not receive a salary from Farmco, and *671 his activity was mainly attributable to checking account activity, executing documents for filing with public authorities, written and telephonic correspondence, and one or two visits per year to observe the operations and confer with Williams. On at least one of petitioner's visits, one of his brothers was also present. Other than petitioner's testimony, the record does not support petitioner's contention that they or Farmco were engaged in the trade or business of farming during 1986, 1987, or 1988. In this regard we did not find petitioner to be a credible witness. As we find in this case, petitioner overstated his deductions, claimed personal expenditures as though they were business, and arbitrarily allocated claimed deductions to different activities in each year to match and reduce income. Therefore, petitioners are not entitled to deduct additional expenses related to Farmco claimed on their Schedules F attached to their joint income tax returns. For 1986, petitioners also claimed a $ 26,061 loss as their share of the loss reported on the subchapter S return of Farmco. Respondent examined Farmco's 1986 return and determined that Farmco's loss was smaller than reported *672 and that petitioners' share of Farmco's 1986 loss was limited to $ 22,693. Petitioners bear the burden of proving that respondent's determination is in error and/or that they are entitled to a loss in excess of that determined by respondent. Rule 142(a); Welch v. Helvering, supra.Petitioners offered no evidence on this item and, accordingly, petitioners' share of Farmco's 1986 subchapter S loss is limited to the $ 22,693 determined by respondent. Petitioners' Schedules C and F Expenses
The Chicago Avenue Property -- was acquired in 1976 by petitioner, his brothers and sister under a contract for deed. Petitioner and three of his brothers owned 22.5-percent interests and his sister and remaining brother owned 5-percent interests. No partnership agreement was entered into by the DeMoss family. This property, located in Minneapolis, Minnesota, consisted of a two-story building housing six commercial units on the first level, and petitioner's and one of his brother's law offices, along with three apartments, on the second floor. It also consisted of another building containing five commercial units and land upon which the lessee, a bank, *673 erected a building. Petitioner's brother's law practice is completely separate from that of petitioner. Another of petitioner's brothers also used office space on the Chicago Avenue property. The DeMosses decided the amount of rent they should pay. During each of the years in issue, petitioner paid $ 5,400 rent monthly, and his brothers paid varying amounts between $ 14,050 and $ 24,000 per annum. No explanation was provided for the disparities between the different rents paid by various of the DeMoss brothers. For 1986, petitioner submitted invoices to the Chicago Avenue property for petitioner's fees of $ 20,450, telephone expense of $ 1,080, and office cleaning expense of $ 1,625. Also for 1986, one of petitioner's brothers submitted an invoice to the Chicago Avenue property for fees of $ 35,350. Finally, for 1986 a second brother of petitioner submitted invoices to the Chicago Avenue property totaling $ 33,694.84, comprised of leasing, management, and miscellaneous services of $ 6,243.84, general management and consulting of $ 20,000, security services and monitoring of $ 2,250, yearend accounting of $ 700, and boiler, janitorial and responses to tenant questions of $ *674 4,500. Nancy Tucker (Tucker) was petitioner's secretary during the years in issue, and she performed work for petitioner and Chicago Avenue property. She was paid 50 percent by petitioner and 50 percent by Chicago Avenue property. Tucker was also reported as an employee of Stevens partnership, but she was not so employed. One of petitioner's brothers was reflected on an employment tax return as an employee of the Stevens partnership, and he purportedly kept the books for the Chicago Avenue property for which he was paid $ 6,243.84 ($ 260.16 semimonthly). The Chicago Avenue property expense ledger shows the $ 260.16 payments sometimes as "supplies" and sometimes as "heating." Also, health insurance payments covering the same brother of petitioner were paid by Chicago Avenue property even though he was not an employee of Chicago Avenue property. There is no evidence that the payments to petitioner's brother were for services rendered or that he was an employee of any of the paying or reporting entities. The distributions and alleged fees paid to petitioner and his relatives concerning the Chicago Avenue property further reflect that the claimed fees were a subterfuge to gain a *675 tax deduction from distributions of profit. In some instances, if fees were paid, the corresponding distributions were generally smaller. Additionally, the distributions did not always appear to correspond with the percentage profit interest of the recipient. Respondent devised a schedule summarizing all the fees and distributions. The records for the Chicago Avenue property are incomplete and do not accurately reflect the transactions and activity of that entity. The following totals are taken from respondent's schedule and reflect the claimed fees and distributions of the Chicago Avenue property for 1986, 1987, and 1988: Claimed Fees
Brother-
Year
Petitioner
Brother 1
Brother 2
In-Law
Sister
1986
$ 20,989
$ 36,050
$ 33,694
$ 1,131
$ 500
1987
15,220
30,700
27,234
1,711
-0-
1988
15,000
11,100
8,055
4,645
-0-
Distributions
Year
Petitioner
Brother 1
Brother 2
Sister
Brother 3
Brother 4
1986
$ 1,100
$ 11,800
$ 589
$ 6,034
$ 2,400
$ 2,400
1987
450
16,450
100
278
1,250
1,250
1988
1,125
16,132
250
250
1,125
1,125
Profit
Percent
22.5
22.5
5
5
22.5
22.5
To the extent that petitioners rely *676 on the claimed fees as deductions on their 1986, 1987, and 1988 returns, they have not shown that the amounts were expended for the stated purpose or that the amounts are ordinary and necessary with the meaning of section 162 or 212. With respect to the Haddon, Willard, 999 Grand properties, or the Stevens partnership no regularly kept books of account, depreciation or amortization schedules, or records of operation were offered by petitioners in support of claimed deductions. Snow Bird Enterprises -- Petitioners, on the Schedules C of their joint Federal income tax returns, conglomerated income and expenses from various activities. These conglomerated activities were denominated "Snow Bird Enterprises" (Snow Bird), and petitioners claimed to be in a trade or business regarding them. Respondent determined that petitioners were not in a trade or business in connection with Snow Bird and that they were not entitled to claim the deductions on the Schedules C attached to their income tax returns. Whether a particular activity constitutes a trade or business is a factual question to be determined from all the facts available to the fact finder. Commissioner v. Groetzinger, 480 U.S. 23 (1987); *677 Whipple v. Commissioner, 373 U.S. 193 (1963). Petitioners also bear the burden of proving this determination is in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). No separate books of account, checking account, business license, or location existed for Snow Bird. Petitioner reported his investment income and some part of his complex interrelated family dealings on the Snow Bird Schedules C. It appears that the results of some portion of petitioner's law practice activity are included in the Snow Bird Schedules C. Petitioner attempted to deduct some of the expenditures of his law practice from the investment receipts through using the Snow Bird Schedule C approach. Snow Bird had no separate books of account, telephone, bank account, clients, or other indications of business activity other than as a focal point on petitioners' return to report petitioners' real estate investments and related activity. Some part of the activity reported on Snow Bird's Schedules C were more likely part of petitioner's law practice. In this regard, with few exceptions, checks offered in support of petitioner's claimed deductions *678 for Snow Bird were from petitioner's law practice accounts. Also, deposits were made into the law practice accounts. It should also be noted that petitioner's law practice (the corporation) billed the Chicago Avenue property for reimbursement of telephone and office cleaning expenses. Petitioners' activities with respect to their investments mainly concern contracts for deeds in which petitioners received a percentage share of income from purchasers under contracts for deed. Petitioners' involvement with the investments did not rise to the level of a separate trade or business. See Skoglund v. United States, 230 Ct. Cl. 833, 835 (1982); Shaller v. Commissioner, T.C. Memo. 1984-584. Instead, petitioners' activity and involvement were predominantly as investors in connection with passive investments in real property. Here again, other than petitioner's testimony (which we have not found to be credible), there is a paucity of evidence supporting petitioners' claim that Snow Bird was a separate trade or business. Petitioner's arbitrary mixing of his law practice and investing activities has further complicated this *679 matter and worked against petitioners in their attempt to show a separate business existence of Snow Bird. Legal Principles Connected With Petitioners' Deductions Claimed on Schedules C or F -- Having decided that petitioners were not entitled to trade or business deductions in connection with farming activities or Snow Bird, we must decide whether any part of the Schedule C or F items claimed in the aggregate amounts of $ 48,741, $ 19,073, and $ 25,779 for 1986, 1987, and 1988, respectively, are otherwise allowable. If allowable, we must also decide whether these items are deductible from gross income under section 62(a) or from adjusted gross income under section 63. This distinction may be significant because of the threshold limitation on itemized deductions under section 67. In general, no deduction is allowed for an item unless it is: (1) Ordinary, necessary, and reasonable, Welch v. Helvering, supra; Commissioner v. Tellier, 383 U.S. 687 (1966); (2) paid or incurred in the taxable year; (3) related to a business activity or otherwise specifically permitted by statute; (4) not a capital expenditure, sec. 263; *680 Woodward v. Commissioner, 397 U.S. 572 (1970); and (5) not a personal expenditure, sec. 262; Elliott v. Commissioner, 40 T.C. 304 (1963). Claimed Deductions for Salary Payments to Petitioners' Daughters -- For 1986, 1987, and 1988, petitioners claimed $ 13,040, $ 4,503, and $ 12,336, respectively, on the Snow Bird Schedules C as deductions for salaries paid to their daughters. For 1987 and 1988, petitioners claimed $ 9,025 and $ 4,100, respectively, on the Farmco Schedule F as deductions for salaries paid to their daughters. Petitioners did not claim a deduction for salaries paid to their daughters on the Schedule F for 1986 because a loss was reported from Farmco operations for 1986. Instead, petitioner claimed the entire salary amount for 1986 on the Snow Bird Schedule C. The payments were made by checks drawn, as follows: 1986 Payee
Date Amount Christine
July 3
$ 300
Dec. 30
4,680
Catherine
Dec. 30
3,380
Diane
Dec. 30
2,600
Joanne
Dec. 30
2,080
Total for 1986
$ 13,040
1987 Christine
June 30
$ 750
Aug. 3
750
Sept. 1
750
Oct. 3
750
Nov. 2
750
Dec. 2
750
Dec. 30
950
Catherine
Dec. 30
3,380
Diane
Dec. 30
2,600
Joanne
Dec. 30
2,080
Total for 1987
$ 13,510
1988 Christine
Jan. 31
$ 750
Feb. 29
750
Mar. 31
750
Apr. 29
750
May 31
750
June 30
750
July 29
750
Aug. 31
750
Sept. 30
750
Oct. 31
750
Nov. 30
750
Dec. 29
750
Dec. 29
2,756
Catherine
Dec. 29
2,600
Diane
Dec. 29
1,560
Joanne
Dec. 29
520
Total for 1988
$ 16,436
*681 The payments made to Christine prior to the final payment of each year were not based upon a computation of the amount of time worked. The records offered by petitioner in support of the claimed deduction of salaries to their daughters were, to some extent, contradictory, inconsistent, or incredible. For example, at times when petitioners' daughters were actually in Minnesota, their time sheets reflected that they were "Inspecting Farm/Citrus" or "Meeting-Farmer/Operator". Some of the tasks alleged to have been performed by petitioners' daughters were beyond their capabilities at the time involved. [5] In spite of these evidentiary weaknesses, the record supports a finding that petitioners' daughters did assist their parents by performing bookkeeping and other tasks in connection with investment activity. Petitioners' daughters performed services which are deductible in connection with petitioner's real estate investment activities as follows: Daughter
1986
1987
1988
Christine
$ 1,500
$ 1,500
$ 1,500
Catherine
1,000
1,000
1,000
Diane
750
750
750
Joanne
500
500
500
Total
$ 3,750
$ 3,750
$ 3,750
*682 Travel While Away from Home -- For 1986, 1987, and 1988, petitioners, on Schedule C of their returns, claimed travel while away from home in the amounts of $ 8,262, $ 3,276, and $ 778, respectively. For 1988 petitioners, on Schedule F of their return, claimed travel while away from home in the amount of $ 2,514. In support of their claimed deductions, petitioner supplied invoices and other records based on which we make the following findings: Number of
Mode of
Total of Transportation,
Date
Destination
Travelers
Travel
Lodging, Meals, etc.
Substantiated
Allowable
1/86
Duluth, Minn.
2
Auto
$ 193.93
-0-  2/86
Harlingen, Tex.
1
Plane
475.31
475.31
3/86
Orlando, Fla.
1
Plane
299.00
-0-  6/86
Rochester, Minn.
2
Auto
445.38
-0-  7/86
Phoenix, Ariz.
5
Plane
1,262.53
-0-  7/86
Anaheim, Calif.
5
Auto
389.24
-0-  8/86
Winnipeg, Canada
2
Auto
391.17
-0-  8/86
Padre Island, Tex.
6
Plane
3,437.22
572.87
11/86
Harlingen, Tex.
2
Plane
668.05
668.05  Totals for 1986
$ 7,561.83
$ 1,716.23
1/87
Harlingen, Tex.
1
Plane
$ 454.88
$ 454.88
3/87
Orlando, Fla.
6
Plane
2,566.00
-0-  7/87
Ariz. & Calif.
6
Plane
2,611.65
-0-  11/87
Harlingen, Tex.
2
Plane
822.79
411.40  Totals for 1987
$ 6,455.32
$ 866.28
2/88
Harlingen, Tex.
2
Plane
$ 789.16
$ 394.58
7/88
Padre Island Tex.
5
Auto
2,226.73
445.34
8/88
Phoenix, Ariz.
5
Plane
2,445.89
-0-  12/88
Padre Island Tex.
2
Plane
890.41
455.20  Totals for 1988
$ 6,352.19
$ 1,295.12
*683 On each of the trips to Texas, petitioner met with Williams and handled matters concerning Farmco and his Texas investments. When petitioners traveled as a family group (five or six travelers), they stayed in resort hotels and/or visited vacation spots such as Disneyland. The record reflects that petitioner's expenses on trips to Texas are the only ones deductible as business or investment related travel while away from home. Depreciation -- For 1986, 1987, and 1988, petitioners, on the Snow Bird Schedule C, claimed $ 887 in each year for depreciation of a computer system located at petitioner's law office. For 1987, petitioners claimed, as depreciation, the entire cost ($ 2,194) of a second computer that was located in petitioners' home. The computers were used for the law practice, real estate and related investments, and for personal purposes. If the computer acquired in 1987 was used in a trade or business, the entire cost (up to $ 10,000) would be deductible in the year of purchase under section 179. Section 179, however, does not apply to capital assets purchased for use in connection with section 212 activities. Additionally, section 280F(b) limits computer depreciation *684 to a straight-line recovery over its earnings and profit life where business use does not exceed 50 percent. Based upon the evidence in this record, we find that petitioners' use of the two computers was one-third for the law practice, one-third for investment, and one-third personal. Accordingly, petitioners are entitled to deduct $ 296 for each of the taxable years 1986, 1987, and 1988 as depreciation in connection with the use of the law office computer for section 212 activity. Additionally, petitioners are entitled to depreciation in the amount of $ 61 for each of the taxable years 1987 and 1988 in connection with use of the home computer for section 212 activity ($ 2,194 divided by 12 divided by 3). Automobile Expenses -- For 1986, 1987, and 1988, petitioners claimed deductions on the Snow Bird Schedules C for automobile expenses in the amounts of $ 5,370, $ 3,641, and $ 3,400, respectively. For the same 3 taxable years, petitioners claimed deductions on the Schedules C in connection with petitioner's law practice, for automobile expenses in the amounts of $ 4,885.95, $ 5,142.01, and $ 5,642.56, respectively. For 1986, petitioners operated a 1986 Laser, and 1979 and *685 1983 Cadillacs. For 1987, petitioners operated 1979, 1983, and 1987 Cadillacs. For 1988, petitioners operated the same three Cadillacs as 1987 and a 1988 Acura. Petitioner's yearend expense summaries indicated auto expenses for 1986, 1987, and 1988 in the amounts of $ 10,034.13, $ 11,613.91, and $ 13,598.40, respectively. Petitioners substantiated automobile expenses for 1986, 1987, and 1988 in the amounts of $ 9,261.52, $ 9,504.77, and $ 10,361.27, respectively. No contemporaneous logs or records of automobile usage were maintained for the years in question. Petitioners' vehicles were, to some extent, operated for personal, nonbusiness purposes. Petitioner's records of automobile use were not trustworthy and were modified and/or prepared for purposes of trial. Petitioners did not present sufficient evidence to carry their burden of showing that they were entitled to any deduction in connection with the use of their automobiles during 1986, 1987, and 1988. Additionally, the substantiation requirements for automobile expenses are particularly strict under section 274(d)(4). Rent Deductions -- For the taxable years 1986, 1987, and 1988, petitioners claimed rent expense *686 deductions for space used at the Chicago Avenue property, as follows: Alleged entity
1986 1987 1988 Snow Bird
$ 3,600
$ 1,200
$ 1,200
Petitioner's law practice
1,800
4,200
4,200
Petitioner's law practice was conducted in office space at the Chicago Avenue property under an oral month-to-month agreement. Petitioner made $ 450 monthly payments to Chicago Avenue property. The payments were made by two $ 225 checks each month, one from petitioners' account and one from an account for petitioner's law practice. Petitioner arbitrarily allocated the $ 450 monthly payments between the law practice and Snow Bird. No evidence was presented to support the allocation made by petitioner. Petitioner's brother, who also practiced law in offices located in the Chicago Avenue property, paid $ 24,000 annually in rent. No explanation was provided as to the disparity between these two rentals. Petitioner manipulated income and deductions in order to best offset amounts of income and not necessarily in accord with the realities of the situation. There is no credible evidence supporting a deduction for rent in connection with petitioners' investment or section 212 activity. *687 Accordingly, petitioners are not entitled to any deductions for rent for 1986, 1987, or 1988. It should be noted that deductions for rent, supplies, postage, etc., insofar as attributable to petitioner's law practice would be allowable, if at all, only on the corporate returns for the law practice. Supplies Deductions -- For 1986, 1987, and 1988, petitioners, on the Snow Bird Schedules C and on the law practice's returns, claimed supplies and related items as follows: Entity
Item 1986
1987
1988
Snow Bird
Supplies
$   515.00
$   236.75
$   202.13
Law practice
Supplies
848.89
1,560.03
1,024.56
Law practice
Postage, etc.
2,633.58
3,546.50
4,130.99
Although these expenditures were paid through the resources of the law practice, the deductions were allocated between the law practice and Snow Bird. Respondent argues that petitioner provided checks and invoices for supplies, related items, and otherwise deductible items in the total amounts of $ 1,410.16, $ 2,170.20, and $ 1,996.08 for 1986, 1987, and 1988, respectively. Based upon the evidence in the record we find that petitioners are entitled to supplies deductions for 1986, 1987, and 1988 in connection *688 with their section 212 activity in the amounts of $ 150, $ 150, and $ 150, respectively. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Miscellaneous Items -- For 1986, petitioners claimed $ 1,920 as a miscellaneous deduction in connection with Snow Bird. In support of this claim, petitioners offered checks totaling $ 1,035 issued from the law practice account payable to cash and containing the reference "misc." and other evidence reflecting payments for items such as newspapers, a fan for petitioners' residence, and some indications of bank charges for petitioners' bank account. Petitioners have not shown that any of these items were expended for a deductible purpose. Our review of the checks and evidence underlying the $ 1,920 reflects that a substantial portion of the items are either for personal purposes or not sufficiently identified to be connected with a deductible activity. Accordingly, we hold that no amount of the $ 1,920 claimed miscellaneous deduction for 1986 is allowable. Insurance -- For 1986, 1987, and 1988, checks were issued from the corporate law practice account in payment of insurance premiums to cover health *689 insurance for petitioners' daughters, legal malpractice and workman's compensation, and fidelity bonds. The totals of the checks written for 1986, 1987, and 1988 were $ 8,780.02, $ 10,369.24, and $ 7,587.32, respectively. The corporate returns for the law practice reported deductions for insurance for 1986, 1987, and 1988 in the amounts of $ 6,065, $ 8,643, and $ 5,446, respectively. Petitioners, on the Snow Bird Schedules C for 1986, 1987, and 1988, reported deductions for insurance in the amounts of $ 3,033, $ 2,447, and $ 2,141, respectively. The deductions claimed on the Snow Bird Schedules C were for pro rata portions of each type of insurance purchased. Additionally, for 1986 and 1987 the sum of the deductions claimed in connection with the law practice and Snow Bird exceeded the total amount of the checks issued for insurance. Petitioners have not shown that the amounts claimed on the Snow Bird Schedules C were deductible under section 212. Of the total amounts claimed for insurance, the amounts that concerned health insurance totaled $ 4,939.02, $ 4,914.24, and $ 2,569. Those amounts may, to some extent, be deductible under section 213. For 1986, section 213(d)(1)(C) *690 limits the amount deductible to the amount that exceeds 5 percent of petitioners' adjusted gross income. For 1987 and 1988, the floor was increased to 7-1/2 percent of adjusted gross income. Accordingly, to the extent that petitioners can utilize itemized deductions for 1986, 1987, or 1988, they would be entitled to claim the excess over the floor under section 213(d)(1)(C) in any such year. Petitioners have not otherwise shown that they are entitled to any additional deductions for insurance. Professional Expenses --For 1986, 1987, and 1988, petitioners claimed $ 2,730, $ 2,500, and $ 4,000, respectively, for professional expenses. Petitioners now claim $ 4,500 for 1988. The claimed deductions are comprised of $ 2,000 in each of 1986 and 1987 and $ 4,000 in 1988 to Southwest Agritek, an activity owned by petitioner's brother in connection with Farmco. The remainder of the amounts now claimed are for payments to K. and N. Tucker in the amounts of $ 730, $ 500, and $ 500 for work on petitioners' computers. Petitioners have not shown the quantity, detail, or purpose of the services or performance received in exchange for the payments to Southwest Agritek, and accordingly *691 those amounts are not deductible. With respect to the work on petitioners' computers, one-third of those amounts is deductible in connection with the investment activity of petitioners. Accordingly, petitioners are entitled to deduct $ 243, $ 167, and $ 167 for professional expenses for 1986, 1987, and 1988, respectively. Office Expenses --For 1986, $ 1,316 was claimed on the Snow Bird Schedule C and was attributable to cleaning the law offices at the Chicago Avenue property. For the same year, respondent contends that the return for petitioner's law practice reflected $ 1,625 for cleaning the office at the Chicago Avenue property. The $ 1,316 claimed through Snow Bird is either a duplication or an expense of the law practice that is not deductible by petitioners on their joint Federal income tax return. Pension Expense --For 1986, petitioners, on the Snow Bird Schedule C, claimed a $ 7,000 deduction for a Simplified Employee Pension plan (SEP) for petitioner. The $ 7,000 amount claimed was paid on April 13, 1987. In order to be entitled to this deduction, petitioners must show that a "qualified retirement contribution" was made as a "qualified voluntary employee contribution" *692 to a "qualified employer plan". Secs. 219(e)(1)(A), 219(e)(2)(A)(i), 219(e)(3)(A). Petitioner has failed to establish that his contributions went to a qualified plan. Meals --For 1987 and 1988 petitioners, on the Snow Bird Schedule C, claimed $ 116 and $ 460 for meals expense for family meals at which petitioners claimed to have discussed investments with their daughters. Some of these meals were at home and some in restaurants. Petitioners have not shown that they meet the substantiation requirements of section 274(d) in connection with these items, and accordingly no amount for meals is allowable. Telephone -- For 1986, 1987, and 1988, telephone expenses were claimed as follows: Entity
1986
1987
1988
Snow Bird
$ 1,067.83
$   266.31
$   374.86
Law practice
2,135.67
2,869.14
2,716.35
Totals
$ 3,203.50
$ 3,135.45
$ 3,091.21
The law office and residential telephone bills, however, reflected the following yearly totals: Place
1986
1987
1988
Residence
$   569.41
$   482.62
$   617.21
Law office
2,620.61
2,390.62
2,419.14
Totals
$ 3,190.02
$ 2,873.24
$ 3,036.35
In addition, petitioner's law practice billed the Chicago Avenue *693 property $ 1,080, at least in one of the years, for telephone expense. The record in this case reflects relatively limited telephone use in connection with petitioners' investments. It should also be noted that the amounts claimed for Snow Bird and the law practice combined exceed the telephone bills submitted. Also, it appears that no part of the telephone bills (including the ones for the residence) were allocated for personal purposes. Taking these aspects into consideration, we hold that petitioners are entitled to deductions for telephone expense in connection with their investments in the amounts of $ 142, $ 121, and $ 154 for the years 1986, 1987, and 1988, respectively. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Additions to Tax
Respondent determined additions to tax under section 6653(a)(1)(A) and (B) for 1986 and 1987 and section 6653(a)(1) for 1988. Both sections provide for a 5-percent addition to tax if any part of the underpayment of tax is due to negligence or disregard of the rules or regulations. Section 6653(a)(1)(B), however, provides for an additional amount equal to 50 percent of the interest payable on the *694 portion of the underpayment attributable to negligence. In this case, respondent determined that the additional 50 percent interest is applicable to the entire deficiency for each of the years 1986 and 1987. Negligence is defined as lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). It is clear from the record in this case that petitioners' reports of income contained unsupported items, arbitrary allocations, and personal items claimed as business. In addition, petitioners failed to keep adequate records of all reported activities. It is for those reasons and because petitioners did not comply with the rules and regulations that they are liable for negligence additions in each of the 3 years under consideration. In this regard, the entire underpayments determined for 1986 and 1987 are due to petitioners' negligence for purposes of section 6653(a)(1)(B). Respondent also determined that petitioners are liable *695 for an addition to tax in each year for a substantial understatement of income tax under section 6661. That section provides for a 25-percent addition for a substantial understatement. A substantial understatement is one that exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. An understatement, for purposes of section 6661, does not include amounts attributable to: (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. [Sec. 6661(b)(2)(B).]
Petitioners have not established that there was substantial authority for the items questioned by respondent or that their returns contained adequate disclosure of the questioned items. Accordingly, petitioners are liable for the additions to tax under section 6661 for all 3 taxable years. Section 6673 Penalty
Respondent has requested this Court to exercise its discretion under section 6673 to impose a penalty on petitioners for maintaining and instituting this *696 proceeding primarily for delay and for maintaining frivolous and groundless positions. If we so find, we may require a taxpayer to pay a penalty not exceeding $ 25,000. Respondent argues that petitioners were dilatory in the pre-trial portion of this proceeding, especially with respect to discovery and helping to organize this case for trial. Respondent also points out that petitioners' evidence fell far short of proving their claimed deductions. Although we agree that petitioners' proof in some areas was far from the mark, that aspect of this case did not rise to the level of maintaining a frivolous and groundless. Further, if petitioners were dilatory in their pretrial activity, that does not automatically mean they maintained this proceeding primarily for delay. Accordingly, we decline to exercise our discretion under section 6673 in this case. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Due to the large number of individual factual issues, our findings of fact and opinion have been consolidated by topic and/or issue.↩
1. Plus 50 percent of the interest due on any deficiency determined up to $ 24,038.↩
2. Plus 50 percent of the interest due on any deficiency determined up to $ 13,090.↩
3. The applicable section for 1988 is 6653(a)(1).↩
4. This section in not applicable for the 1988 taxable year.↩
2. Section references are to the Internal Revenue Code as amended and in effect for the taxable years under consideration. Rule references are to the Rules of Practice and Procedure of this Court.↩
3. For the years under consideration, the difference between itemized interest deductions and those deductible from gross income is most significant. This is so due to the phase-out of itemized interest beginning in 1987 with progressively larger percentages for several years. Accordingly, for those years, petitioners' ability to deduct itemized interest may be limited in several ways. Because the amount of interest paid is, during the years under consideration, always smaller than the interest received, we do not have to consider the limitation of sec. 163(d).↩
4. In this regard, petitioners may qualify individually or may qualify to claim deductions from gross income for the farming activity if the S corporation is found to be in the trade or business of farming.↩
5. Petitioner called his daughters to testify. Initially, they attempted to testify from a prepared statement which contained detailed tasks purportedly performed. Some of these included the review of legal documents, such as deeds or leases or other matters that they would not likely be able to perform. Upon inquiry from the Court, it became clear that to some extent petitioner's daughters did not have independent memory of the events in question and/or that the alleged tasks were not accomplished.↩